NOT DESIGNATED FOR PUBLICATION

Nos. 126,639
126,640

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interests of A.S. and D.W.,
Minor Children.

MEMORANDUM OPINION

Appeal from Harvey District Court; MARILYN M. WILDER, judge. Submitted without oral argument. Opinion filed May 10, 2024. Affirmed.

*Ben Baumgartner*, of Baumgartner Law Office, of Newton, for appellant natural mother.

*Laura E. Poschen*, special prosecutor, *Sandra L. Lessor*, deputy county attorney, for appellee.

Before ARNOLD-BURGER, C.J., CLINE and COBLE, JJ.

PER CURIAM: Mother appeals from the district court's order terminating her parental rights to her children, A.S. and D.W. On appeal, she focuses on the court's finding that she was unfit and argues this conclusion was not supported by clear and convincing evidence. Specifically, she contends the court misapplied the statutory factors and focused on negative evidence, ignoring positive indications that weighed against termination of her parental rights. After careful review, we find no error and affirm the district court's judgment as its findings were reasonable and supported by the evidence.

FACTUAL AND PROCEDURAL HISTORY

On February 5, 2021, the State petitioned to have A.S. and D.W. declared children in need of care (CINC). A separate case was filed for each child; but the cases were heard

1

together throughout the district court proceedings and are consolidated on appeal. The fathers of both children surrendered their parental rights and are not a topic of this appeal. The State also filed a petition regarding an older sibling, P.P., but that case was handled separately and is not part of this appeal.

The petitions were precipitated by the following events. First, the week before the State's filing, Mother was a victim of domestic violence perpetrated by D.W.'s father in front of the children, which left Mother in the hospital. While at the hospital, Mother met with a Kansas Department for Children and Families (DCF) child protection specialist.

That DCF employee was later contacted by hospital staff about Mother displaying strange behavior and speaking incoherently. Shortly after Mother was discharged from the hospital, police officers found her wandering in a nearby neighborhood and escorted her home. The next day, when Mother walked into a stranger's home in the middle of the night, law enforcement decided to take her to a local hospital, and she was subsequently transferred to Larned State Hospital (Larned) for treatment. Although a drug screening taken at the time revealed no substances in Mother's system aside from marijuana, the admission paperwork noted Mother was suffering from significant paranoid delusions and hallucinations. Based on the hospital's reports, DCF was unsure when Mother would be released, or if she would be capable of taking care of the children when released. The combination of these concerns and the events of the prior week triggered the State's decision to file its petitions. At that time, A.S. was two years old and D. W. was seven months old.

Four days after the State filed its petitions, the district court held a temporary custody hearing. The court found probable cause to support the State's allegations and ordered A.S. and D.W. to be placed in the temporary custody of DCF.

DCF then crafted a six-month permanency plan, which noted Mother's history of substance abuse, including a prior methamphetamine addiction and current marijuana use; mental health issues; and concerns about people with whom Mother associated who potentially placed A.S. and D.W. at risk. The plan included numerous tasks for Mother to complete to achieve the ultimate goal of reintegration, including: addressing her mental health stability to allow her release from Larned and maintaining that stability upon her release; maintaining her sobriety and submitting to random drug screenings; completing a mental health evaluation; participating in certain parenting courses; maintaining appropriate and stable housing and providing proof of utility and rent payments; obtaining stable employment and providing proof of pay stubs; and completing other psychological testing as required by DCF to determine her competency and mental health.

Less than a week after the children were placed in DCF custody, Mother was arrested for disorderly conduct and readmitted to Larned. An initial case plan meeting was held around that same time, but Mother had been unable to make any progress toward the case plan tasks. By the time Mother was released from Larned a month later, she was evicted from her home. After Mother's release, a St. Francis Ministries (SFM) court report noted the primary concerns for reintegration remained Mother's need "to obtain stable housing and income, achieve and maintain sobriety, and address her mental health needs and legal concerns."

Two months after the petitions were filed, the district court adjudicated A.S. and D.W. as CINC, finding clear and convincing evidence showed the children were "without adequate parental care, control or subsistence and the condition is not due solely to the lack of financial means of [their] parents or other custodian" and "without the care or control necessary for [their] physical, mental or emotional health." Mother did not contest this finding.

Over the following year, SFM, a Citizen Review Board (Board), and eventually a court appointed special advocate (CASA) filed frequent reports documenting Mother's progress, or lack thereof, on her reintegration plan. Early on, the Board noted Mother was making some progress but concluded the children should remain in DCF custody until Mother could demonstrate more consistency managing her mental health and maintaining stable housing and employment. Throughout this time, Mother was only able to have weekly, supervised visits with the children. Within a few months, Mother began to struggle with visitations—the SFM caseworker noted Mother was unable to properly supervise A.S. and D.W. on her own and raised concerns about her general cognitive capability to care for the children.

Despite the concerns, a late 2021 report explained that even with Mother's "delayed processing speeds," she was attending therapy, had provided several negative drug screenings, and had recently obtained housing the caseworker deemed appropriate. The same month, a Board report found Mother was providing for the children's needs during the weekly supervised meetings, she and the children had a strong bond, and she was working on a safety plan to implement while watching the children. But later reports disclosed Mother lost her housing. Around this time, the CASA advocate began noting concerns regarding Mother's lack of overall progress and voiced apprehension about the goal of reintegration.

Over the following months, Mother moved into several different residences and held a variety of jobs. She was arrested on an outstanding warrant in another matter and failed a drug screening after using a hemp-derived cannabis product. A CASA report raised safety concerns, including that Mother was living with her brother. A permanency plan approved around that time explained Mother would need to actively engage in the case plan tasks before visitation could be expanded or unsupervised. But then, 18 months after the case was initiated, the district court held a permanency hearing and concluded reintegration was no longer a viable goal due to Mother's inadequate progress.

The State then moved for termination of Mother's parental rights. In its motion, the State alleged that Mother was unfit due to multiple statutory factors, including: (1) an emotional or mental illness, mental deficiency, or physical disability that rendered her unable to care for the children under K.S.A. 38-2269(b)(1); (2) her substance abuse issues as demonstrated by her failure of several drug screenings under K.S.A. 38-2269(b)(3); (3) lack of effort to adjust her circumstances to meet the children's needs—primarily due to her inconsistent efforts to address her mental health and to maintain consistent housing and employment under K.S.A. 38-2269(b)(8); (4) her failure to assure adequate care of the children during visitation under K.S.A. 38-2269(c)(1); and (5) her failure to work toward completion of the case plan despite reasonable efforts made by the State under K.S.A. 38-2269(c)(3). The State argued termination was in the best interests of the children, noting that A.S. and D.W. had, at that time, been in State custody for 20 months and during that time Mother failed to maintain stable and appropriate housing, was inconsistent in her efforts to address her mental health, struggled with finances and continuing employment, and displayed an inability to choose appropriate people to be allowed in her home.

Seven months later, the district court held an evidentiary termination hearing. The State called Mother, Lesley Young (a family support worker at SFM), Judy Reimer (the CASA advocate), and Julia Creed (a social worker and permanency specialist at SFM) as witnesses. At the time of the hearing, the children had been in DCF custody for approximately 27 months. Details of the testimony will be addressed in the analysis of the district court's findings below.

After considering the evidence and the parties' arguments, the district court concluded clear and convincing evidence demonstrated that Mother was unfit to parent and that her condition was unlikely to change in the foreseeable future. In explaining its decision, the court referenced each of the five statutory subsections set forth in the State's motion. The court also noted that, under K.S.A. 38-2269(b)(9), the children had been in

State custody for 15 of the most recent 22 months, and under K.S.A. 38-2269(c)(3) DCF and St. Francis had provided Mother with a reasonable plan and made available resources, which Mother had either failed to utilize or inconsistently taken advantage of. In making its ruling, the court also noted the necessity of viewing the case in child time, emphasizing the children had been in DCF's custody for most of their lives, and it concluded that termination was in the best interests of A.S. and D.W.

Mother timely appeals.

### WE FIND NO ERROR IN THE TERMINATION OF MOTHER'S PARENTAL RIGHTS

On appeal, Mother argues the district court erred in terminating her parental rights because it misapplied the law and failed to sufficiently credit factors that weighed against its finding of unfitness. Mother presents no argument on the district court's finding that her circumstances were unlikely to change in the foreseeable future, nor that termination of her parental rights was in the best interests of her children. As such, we do not review those aspects of the district court's ruling. See *In re Adoption of Baby Girl G.*, 311 Kan. 798, 803, 466 P.3d 1207 (2020) (an issue not briefed is deemed waived or abandoned).

*Applicable Legal Principles*

The fundamental nature of a parent's right to parent his or her children demands that to terminate parental rights, the State must prove "by clear and convincing evidence that the parent is unfit by reason of conduct or condition which renders the parent unable to care properly for a child and the conduct or condition is unlikely to change in the foreseeable future." K.S.A. 38-2269(a); see *In re R.S.*, 50 Kan. App. 2d 1105, Syl. ¶ 1, 336 P.3d 903 (2014).

6

After a district court has adjudicated a child as CINC under the Revised Kansas Code for Care of Children (Code), K.S.A. 38-2201 et seq., the court may subsequently terminate parental rights only if the State proves three elements by clear and convincing evidence: (1) the parent is unfit; (2) the conduct or condition which renders the parent unfit is unlikely to change in the foreseeable future; and (3) termination of parental rights is in the best interests of the child. K.S.A. 38-2269(a), (g). The statute lists nonexclusive factors the district court shall consider in making its determination of fitness. K.S.A. 38-2269(b)(1)-(9), (c)(1)-(4), (f). These factors may amount to unfitness singularly or in combination, and any one of the factors may, but does not necessarily, establish grounds for termination of parental rights. K.S.A. 38-2269(f).

In reviewing the district court's fitness determination, "this court must determine, after reviewing all the evidence in a light most favorable to the State, whether a rational fact-finder could have found the ultimate determination to be highly probable, i.e., by clear and convincing evidence." *In re T.H.*, 60 Kan. App. 2d 536, 547, 494 P.3d 851 (2021). Appellate courts do not "weigh conflicting evidence, pass on the credibility of witnesses, or redetermine questions of fact." 60 Kan. App. 2d at 547.

*We find Mother's arguments regarding the district court's application of statutory factors unpersuasive.*

As noted above, K.S.A. 38-2269 lists several nonexclusive circumstances that can render a parent unfit. Here, the district court referenced multiple factors it found supported a declaration that Mother was unfit. Mother contends that the court failed to sufficiently analyze each of these factors when it made its determination on her unfitness or, alternatively, that the State failed to present sufficient evidence to support the court's findings.

7

Before turning to the district court's analysis of the individual factors, we pause to address Mother's contention that the district court erred by ignoring factors that would have supported a finding of fitness. Specifically, Mother argues that the court should have given weight to the fact that several statutory factors did not apply—that is, the absence of evidence to support certain factors should have tipped the scale against a finding of unfitness. Mother provides no authority for the proposition that the inapplicability of any factors listed in K.S.A. 38-2269(b) and (c) should be considered as grounds supporting a finding of parental fitness. And she recognizes that any *single* factor under the statute, standing alone, may establish sufficient grounds for termination. K.S.A. 38-2269(f). So, her contention that the district court failed to credit the positive facts that she was not abusive toward her children, she was not convicted of any felony, and no injuries or death occurred under her care does not bolster her argument on appeal. These factors were simply inapplicable to the court's determination of her unfitness. See K.S.A. 38-2269(b) ("In making a determination of unfitness the court shall consider, but is not limited to, the following, *if applicable*[.]" [Emphasis added.]).

What's more, Mother's claim the district court failed to credit the efforts she did make is contradicted by the record. The district court's ruling is replete with references to Mother's love for her children, her periodic attempts to accomplish case plan goals, and her efforts to regain housing and employment throughout the case. It cannot be said that the district court abused its discretion by focusing solely on negative factors—the court simply focused on those factors applicable to the facts before it. We review the factors analyzed by the district court, and challenged by Mother, in turn.

1. *K.S.A. 38-2269(b)(1)—Mental Health Conditions*

Mother argues the district court failed to conduct any meaningful analysis regarding whether her mental health conditions rendered her unable to care for her children. But her argument is not supported by the record.

This case was initiated, in part, because of the state of Mother's mental health, and throughout the pendency of the case, social workers documented ongoing concerns with her mental health struggles, which included several stays in inpatient treatment centers. Although Mother testified at the termination hearing she had mostly sought mental health treatment only on an as-needed basis, she had started regularly attending case management and counseling sessions over the past month and was consistently taking her medications. Mother testified her new medications, therapy, and other resources were helping her to be more stable and she believed she would be able to properly parent her children in six months. But she conceded that forcing A.S. and D.W. to wait six more months was unfair, though she believed terminating her rights would be equally unfair.

Caseworkers' testimony suggested this was too little, too late. They expressed that these conditions (and Mother's inconsistent efforts to abate them) had affected her ability to parent A.S. and D.W. throughout the two-year pendency of the case. CASA worker Judy Reimer explained how she believed Mother's emotional and mental stability remained a barrier to her ability to appropriately care for the children and opined that Mother had not adequately addressed these issues.

Similarly, both SFM social workers explained that Mother's efforts toward addressing her mental health issues were inconsistent at best. One of these social workers, Lesley Young, pointed out that Mother's most recent mental health episode necessitating inpatient treatment had occurred just two months before the termination hearing. In short, the evidence presented established that Mother endured a history of mental health issues for which she sought treatment inconsistently, and these struggles frequently impaired her ability to care for her children during the pendency of the case. The testimony of the caseworkers, which directly connected Mother's mental health to her ability to care for the needs of her children, supports the district court's conclusion that Mother's mental health rendered her unable to appropriately care for the needs of A.S. and D.W.

9

Contrary to Mother's assertions on appeal, the district court recognized her multiple mental health diagnoses, alone, were insufficient to render her unable to parent her children. But the district court went on to find that her inconsistent treatment of those health concerns, either in terms of medication or therapy, is what affected her ability to parent. Those concerns were evidenced by the testimony of the witnesses, her treatment at several inpatient facilities, and the psychological and mental health evaluations that were conducted during the two-year pendency of the case. On our review, we conclude the district court's findings on this factor are supported by clear and convincing evidence.

2. *K.S.A. 38-2269(b)(3)—Substance Abuse*

Next, Mother argues the court erroneously conflated her history of drug abuse and failure of several drug screenings with her ability to parent her children. There is no doubt Mother's substance use was an issue in this case. The original case plan acknowledged Mother's history of substance abuse, including a prior methamphetamine addiction and current marijuana use, and required her to obtain substance evaluations, maintain sobriety, and submit to random testing.

An SFM report in mid-2021 reflected Mother tested positive for methamphetamines, then weeks later tested negative for all substances. At the termination hearing, Young testified that Mother had continuing issues with positive drug tests. Mother admitted she tested positive for THC, which is illegal in Kansas, during the pendency of the case. But she explained she had remained clean from THC for the past six months. Mother maintained she had remained clean from methamphetamine for six years, and claimed the positive drug test for methamphetamine during this case was a false positive. Mother also testified she sought to avoid a relapse by moving into an Oxford House but admitted she was kicked out of the Oxford House for testing positive for drugs, though she later returned to another Oxford location. Though testimony indicated Mother had abstained from methamphetamines since mid-2021, her use of THC

10

and related substances continued to create issues with positive tests. Julia Creed, SFM social worker, testified she had multiple conversations with Mother about her use of any substance which could result in a positive drug test, and that while her children were in custody, Mother could not use any substances.

In the district court's findings, while the district court noted Mother's positive drug screens, it explained the substance use had not necessarily rendered her unable to care for the children, but rather was "one factor in a bigger context" and "while it's admirable that [Mother] anticipated perhaps a relapse and chose to go into an Oxford House, the fact is, while she was at the Oxford House, she was discharged from that house because of a drug screen. So that effort does not work, and, again, we have an issue with substances." In other words, it appears that while the court credited Mother's ability to abstain from using methamphetamines, it acknowledged that Mother's use of marijuana was in express contravention of the case plan and had directly contributed to her being dismissed from a sober living residence.

The record supports the district court's conclusion that Mother's failure to fully address her substance abuse created an impediment to reintegration. While the fact that Mother only had a few positive drug tests, standing alone, may not have rendered her unfit, the State was not required to prove as much—it was sufficient to show that her drug use had impeded reintegration with her children. See *In re M.S.*, 56 Kan. App. 2d 1247, 1258-59, 447 P.3d 994 (2019). Here, Mother's acknowledged drug use—even if infrequent—was a barrier to completing her case plan tasks. When viewing the record in a light most favorable to the State, the district court did not abuse its discretion regarding this factor.

### 3. *K.S.A. 38-2269(b)(7)—Failure of Reasonable Agency Efforts*

Mother's appellate brief does not set out this factor for in-depth analysis like other factors relied upon by the district court. She only incidentally raises the issue, claiming the district court did not discuss the factor at termination, and complains that her limited and supervised visitation with the children did not set her up for success. As discussed elsewhere in this opinion, Mother's visitation was limited due to concerns with her stability and safety of the children. And although it is true the district court simply noted there was no "issue of lack of reasonable efforts" made by the agencies, without elaboration, a reliance on this factor for termination is unnecessary, given the weight of evidence on other factors. The existence of any single factor may be sufficient to establish grounds for termination of parental rights. See K.S.A. 38-2269(f).

### 4. *K.S.A. 38-2269(b)(8)—Parent's Efforts to Adjust Circumstances*

Mother claims the district court failed to appreciate the efforts she made to adjust her circumstances, conduct, or conditions to meet the needs of her children. She claims she completed case plan tasks like taking a parenting course and undergoing a mental health assessment. In her hearing testimony, Mother acknowledged her inability to maintain stable employment or housing during the pendency of the case but argued her ability to find new homes and jobs indicates resilience on her part. Although she was behind on both rent and utility payments, she had been in her current residence for four months and had recently started a new job. Essentially, Mother argues that although she was not necessarily able to adjust her circumstances in the over two years between the CINC adjudication and termination hearing, she made efforts to do so, and her lack of success does not equate to lack of effort.

While Mother is correct that the record supports that she undertook some effort to adjust her circumstances and condition, the overwhelming weight of evidence displays

12

her failure to make the changes required by the reintegration plan. Mother conceded she was not presently fit to parent A.S. and D.W. at the termination hearing and acknowledged her struggles with maintaining stability, but testified she could be ready to do so within the next six months. But none of the social workers who worked with her and the children during the case agreed with her assessment. In fact, Young, Reimer, and Creed all testified they held little hope that Mother would be able to make such a turnaround due to her pattern of briefly engaging in the case plan after court hearings and then losing focus on working on their various concerns. Caseworkers testified that over the course of the case, Mother had relocated to not only different housing, but different communities, approximately 14 times in 20 months. Had the children been with her, these moves would have caused the older child to change schools at least six times in less than two years. Young testified that Mother also had a dozen different jobs over the course of the case, and even Mother acknowledged her frequent job and housing changes did not indicate stability.

Despite Mother's contention that she continued to get up and keep going after each job or home loss, evidence reflected her continued instability. The district court heard this conflicting evidence and found that Mother had failed to adjust her circumstances, and we are not in a position to second guess that decision by reweighing the testimony presented at the termination trial. See *In re B.D.-Y.*, 286 Kan. 686, 705, 187 P.3d 594 (2008) ("[T]he appellate court does not weigh conflicting evidence, pass on credibility of witnesses, or redetermine questions of fact."). Ultimately, the record displays that although Mother seemed to understand what was being asked of her in the case plan, she was not able to adequately address her circumstances and condition with the requisite urgency. Although Mother was able to maintain periodic efforts toward maintaining employment and housing and addressing her mental health and substance issues, for the majority of the case she was either uncooperative or simply unable to make the progress needed to accommodate the needs of her children. As such, we find the district court did not abuse its discretion regarding this factor.

13

### 5. *K.S.A. 38-2269(b)(9)—Length of Time Children in State Custody*

The next statutory factor challenged by Mother considers whether, because of parental action or inaction, the children have been in State custody for 15 of the most recent 22 months preceding the termination hearing. K.S.A. 38-2269(b)(9). Mother argues that the district court should not have weighed the lengthy period her children were in DCF custody against her because it failed to analyze whether that time in State custody was attributable to her actions or inactions. While Mother is perhaps correct that the district court did not explicitly state in its oral ruling that her actions and inactions led to her children's lengthy stay in DCF custody, such a conclusion is implicit in its findings given the evidence in the record.

At the time of the termination hearing, the children had been in DCF custody for 27 months. As outlined above, and immediately preceding the district court's announcement of subsection (b)(9), it had thoroughly addressed Mother's inability to stick to the case plan and maintain adequate housing and employment. The district court noted that, despite Mother's periodic attempts to secure stable housing and employment and to address her mental health and substance abuse issues, her efforts were inconsistent. And by the time of the termination hearing, her visitations had been reduced to a one-hour supervised session per month due to the concerns of the social workers assigned to her case. While the record supports that Mother made some efforts toward completing case plan tasks, her claim that the State created the situation in which she found herself is not borne out by the record. The record supports that Mother's actions and inactions were the predominate cause of the children's remaining in DCF custody throughout the case. Given the evidence in the record, the district court did not abuse its discretion in weighing this factor.

14

### 6. *K.S.A. 38-2269(c)(1)—Inability to Assure Care in Parental Home*

The next statutory factor Mother challenges is the district court's finding under K.S.A. 38-2269(c)(1). Here, Mother contends the State failed to provide clear and convincing evidence of her inability to assure the care of the children in the parental home when she was able to do so. Mother argues because she displayed periods of stability in employment and housing the social workers' concerns regarding the safety of her living situation were not sufficiently established. She also maintains the social workers' concerns regarding her brother's presence in her home was not supported by the evidence presented at the termination trial.

But trial testimony and record evidence counter Mother's claims. Young, the SFM family support worker, testified Mother had consistently lived with her brother and other inappropriate individuals during the case despite being told that it was not safe for her children. Mother admitted her brother had substance abuse issues. Young testified though Mother adamantly denied her brother living with her at one residence, during a supervised visit, Young walked through the home and found the brother living in Mother's basement. Young felt that Mother had disregarded these concerns, despite knowing it would prohibit reintegration. Mother's attitude persisted even after her brother had been responsible for causing a fire at one of her homes and another man had set up booby traps in the yard of another residence.

Creed, another caseworker at SFM, testified Mother had only one hour of supervised visitation per month—down from prior weekly visits—because of Mother's failure to complete case plan tasks and her refusal to keep certain people out of the house so that it would be safe for the children. Creed thought Mother was overly defensive about her lifestyle choices and had a "you-can't-tell-me-who-can-live-in-my-home" attitude when she and other workers raised concerns about the suitability of the home environment.

15

Additionally, testimony at the termination hearing indicated that, along with Mother refusing to abide by the case plan by ensuring the children's safety regarding other people in the home, testimony revealed Mother would soon be looking for a new home, as her current lease was not being renewed. Mother also admitted the only two bills she was responsible for were her rent and electric bill, but at the time of the hearing, she was behind on both. Given the number of prior residences and her upcoming lack of housing, Young expressed that housing stability remained a pressing concern.

As previously addressed, Mother's argument is effectively a request for us to reweigh the evidence, which we cannot do. While it may be true that she made some efforts to successfully care for her children during her supervised visitations and had certain periods of stability during the over two-year history of the case, the evidence also supports the district court's conclusion that she was unable to do so. All the social service workers who testified at Mother's termination hearing echoed the same concerns regarding Mother's inability to perceive appropriate and safe care of the children. Mother's failure to appreciate and address their concerns regarding the safety of her various residences, or the people she allowed to stay in her home, during the pendency of the case supports the district court's finding on this factor, and we find no abuse of discretion.

7. *K.S.A. 38-2269(c)(3)—Failure to Carry Out a Reintegration Plan*

Finally, Mother maintains that the court failed to address her efforts to carry out a reasonable plan for reintegration under K.S.A. 38-2269(c)(3), and merely jumped to the conclusion that she had failed to accomplish case plan goals of maintaining stable housing and employment. Again, Mother's argument that the district court should have more fully explained its rationale falls flat. The district court's ruling from the bench fully explained how Mother repeatedly failed to meet the goals set forth in the reintegration plan over the course of the case. The court noted the reintegration plan was reasonable

16

during the numerous status and permanency hearings, and its analysis of her unfitness thoroughly detailed the ways in which she had been unable to meet the expectations in the case plan. The district court expressed specifically, under subsection (c)(3), that Mother—knowing her brother was an impediment to reintegration—essentially "chose [her] brother over [her] kids," and she had been unable to take care of herself and her children before taking care of other people. The hearing was replete with examples of how Mother failed to maintain consistent employment and housing. Ultimately, the record supports the district court's finding that Mother failed to carry out the reintegration plan, and she demonstrates no abuse of discretion underlying this decision.

*Conclusion*

After carefully reviewing the record and Mother's arguments on appeal, we find clear and convincing evidence in the record to support the finding of Mother's present unfitness. Because Mother cannot apprise us of any error underlying the district court's finding, we affirm its termination of her parental rights.

Affirmed.